**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **MARGARET J. MORALES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **No. 11-2435-JAR** |
| **THE PROCTER & GAMBLE** ) | |
| **MANUFACTURING COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Plaintiff Margaret J. Morales brings this action alleging discrimination on the basis of sex, race and national origin, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").[1] This matter comes before the Court on defendant The Procter & Gamble Manufacturing Company's ("P&G") Motion for Rule 56 Summary Judgment (Doc. 37). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court grants in part and denies in part defendant's motion.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could

---

[1]42 U.S.C. §§ 2000e–2000e-17.

[2]Fed. R. Civ. P. 56(a).

[3]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

return a verdict for the nonmoving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon her pleadings to satisfy her burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by

---

[4]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or taken in the light most favorable to plaintiff.  Plaintiff, who is of Hispanic race/national origin, began her employment with P&G at its manufacturing facility in Kansas City, Kansas in 1989.  P&G employs approximately 315 people at the Kansas City plant, which is known as the Kansas City Soap Plant ("the Plant") because it primarily manufactures liquid dishwashing detergent.  The Plant has two primary departments: the Chemicals Department (which manufactures the soap) and the Converting Department (which

---

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

processes and packages the soap for sale to retailers). The Chemicals Department currently consists of three sub-areas: AGS, Amines, and Surfactants. AGS, a specialty chemical that is used to make bar soap, is a small portion of the production operation at the Plant. Historically, the Plant produced a thick liquid substance known as "tertiary amines" out of raw materials; before December of 2009, the Plant made most of the tertiary amines it needed. After producing the tertiary amines, the Plant processed those into "amine oxide," a substance which gives the soap liquid its sudsing properties. P&G used most of the amine oxide in manufacturing at the Plant, but it sent some to other P&G plants and other soap producers. Creating tertiary amines is a complex five- or six-step process, much more complicated than processing tertiary amines into amine oxide.

In late 2009, P&G decided to stop producing tertiary amines at the Plant, a decision which plays a central role in this case. Thereafter, the Plant has imported all of its tertiary amines. These tertiary amines are still processed into amine oxide, and the resulting liquid is pumped to the Surfactants area. Surfactants give soap liquid its cleansing properties. Finally, the liquid leaves the Surfactants area and goes to the Converting Department.

When plaintiff began working at the Plant in 1989, she had an entry-level position on the manufacturing line that made Zest soap. In 1990 or 1991, she began working in the warehouse. From 1993 until the end of 2009, plaintiff was a member of the Amines Department (later renamed Chemicals Department) on the north side of the complex, a part of the Plant dominated by male workers. When plaintiff took an amines pumper operator position in March of 1993, she became the first woman to work in a production position in the Plant's Amines Department. She faced hostility and resentment from male employees; most of the other female employees who worked in the Amines Department would either quit or bid on more traditional jobs in the Plant such as

logistics, but plaintiff remained in her position.  In 2000, when the Amines Department was about to award without bid the Maintenance Coordinator position to a male with less seniority than plaintiff, plaintiff discussed the issue with the Human Resources manager.  The position was then posted, and plaintiff successfully bid on it.  After holding the position for approximately eight months, plaintiff found that the males in the department made it difficult for her to do her job and in 2001 she took a more traditional position in logistics, still within the Amines Department.  In 2004, her logistics position was contracted out, so plaintiff took a "role job" in the storeroom until late 2006/early 2007 when she returned to her operations position in what was now the Chemicals Department.  P&G had realigned its structure such that all Chemicals Department employees were now classified as "pumpers" or "operators."  Plaintiff was a pumper; as such, her primary duties included paperwork and technical responsibilities, along with physically demanding work that requires going out into the elements, climbing on top of and crawling under railcars, tankers, and ISO-tainers, opening and shutting valves, and hooking up two- to four-inch diameter hoses to pump product in or out of the Plant.

Jeff Olson was the manager of the Chemicals Department from July 1, 2008 until August 1, 2010.[17]  During 2009-10, John Collins was the Chemicals & Surfactants Operations Manager.  On April 22, 2009, Olson completed plaintiff's "Work & Development Plan" in which he wrote that plaintiff's current position was Pumper/Operator Trainee and that by December she was to be trained as a KC Chemical Operator, BOHO (boiler house), and Amine Oxide Processor.

***Tertiary Amine Production Changes***

---

[17]Olson's title was Business Unit Leader over the Chemicals Department.

In 2009, due to increased production costs, P&G was faced with a decision whether to continue to "make" tertiary amines at the Plant or "buy" tertiary amines from outside suppliers. If the company made a "make" decision, its plan was to suspend and rebuild the process for making tertiary amines with less expensive raw materials. If the company made a "buy" decision, the rebuilding process would be unnecessary; instead, P&G would import and pump tertiary amines from railcars or trucks into the facility, which would leave the Plant with only the process of turning the tertiary amines into amine oxide. This decision was to be made by corporate headquarters in Cincinnati, but both Olson and Collins were hoping for a "make" decision so that the Plant could continue producing tertiary amines. Olson and Collins told the Chemicals Department employees that if the company instead made a "buy" decision, which would permanently halt amines production, staffing reductions would be based strictly on seniority.

On September 25, 2009, Olson sent an email asking for volunteers to help him determine the "principles" to be used in deciding who would be moved from the Chemicals Department for approximately six to nine months, "assuming we get the Make decision." He asked that interested employees get back with him by October 9. Plaintiff replied on October 1, stating: "Jeff, I have several concerns about the sub-team you are forming. I would like to request a short meeting with you. . . . Thank you in advance for your time." On October 8, Olson announced via email the members of his sub-team. He had not responded to plaintiff's email, nor had plaintiff told him that she wished to be a part of his sub-team, and her name did not appear on the list of members. Olson met with the sub-team on October 13 and 14 and discussed with them the "skills matrix" he had designed for deciding which employees would be temporarily displaced. On October 15, Olson sent an email to Plant manager Jack Geisinger, Human Resources manager Mia Wise, and others, which

included the following statement: "I am not naming names at this point, but I will do so after we get the make decision."[18]   Some things were already clear with respect to the matrix, however: employees who held "special skills" and those who worked in nonproduction administrative and support positions (including five male members of Olson's sub-team) were not considered for temporary displacement; Olson filled in the matrix and he alone decided what to give employees credit for and what they did not get credit for; Olson did not look at employee work histories, personnel files, or department files as he filled in the matrix, but instead based his decision on what he knew about each employee; the matrix did not give plaintiff credit for leadership roles she held in the Plant; the matrix did not give plaintiff credit for her seven years as an amines operator-pumper, even though retraining her on that position would have taken only two to three weeks and Olson had the idea to push back that training; the matrix did not give plaintiff credit for being a pumping system owner, which she had been from 2007 until July or August of 2009, because she was not currently in that role; the matrix did not give plaintiff credit for being qualified to perform Specialty Pumping; the matrix did not give credit to another Mexican-American employee for being a qualified amine oxide operator; the matrix did give credit to Jay Simmons, a white male employee with relatively low seniority, for being an amine oxide operator even though he was listed as a "pumper" as of July and he was only 75 to 80% complete with his operator training as of December 1; and giving such credit to Simmons was inconsistent with Olson's position that the matrix did not count skills for which an employee was in training.

Olson also prepared a second version of the matrix, although he could not explain why,

---

[18]Two members of the sub-team confirmed to Wise that Olson intended the first version of the matrix to apply only if the company made a "make" decision, thereby causing the moves to be temporary.

which re-ordered employees according to seniority. In the first version, both plaintiff and the only other woman who worked in non-traditional production jobs were scheduled for displacement, but on the seniority-based version plaintiff was ranked fourth in the department and would not have been displaced. Olson testified that the fact that the first version of the matrix would eliminate both women in the Chemicals Department did not cross his mind and did not trouble him. Wise wrote on her copy of Olson's October 15 email the words "discrimination" and "gender/race, age, pay."

On December 1, 2009, P&G's corporate headquarters made the decision that the Plant would no longer make tertiary amines. Olson and Collins were disappointed and understood that the "buy" decision meant that the Plant would permanently discontinue making tertiary amines. Wise knew that the decision meant that employees were going to be removed from the Chemicals Department on a permanent basis. At 1:58 p.m. on that same day, Collins sent an email announcing the decision. Two weeks later, the tertiary amines operations process at the Plant was shut down, leaving only the less-complicated process of turning imported tertiary amines into amine oxide. That meant a 70-80% reduction in the operators' workload.[19] However, the pumping process never stopped; indeed, the amount of pumping work at the Plant increased and the pumping function in the Chemicals Department became more important than ever.

One hour after his email announcing the "buy" decision, Olson sent a second email which announced a list of and timetable for nine employees to be displaced. Despite the earlier statements that displacements would be made strictly on a seniority basis in the event of a "buy" decision, the list included plaintiff and Joe Rivera, the other Mexican-American pumper, to be displaced on

---

[19]All of the operators were male.

8

January 4, 2010, and Hope Eldridge, the only other woman, to be displaced on March 1, 2010.[20] Olson stated in his email that these moves were *temporary* in nature and would last six to nine months. He later admitted that it was clear from the outset that a "buy" decision would mean a *permanent* reduction, and he had no explanation why it took two months beyond the decision for him and Collins to realize this fact. The union obviously realized it, as the union president gave Wise a document on December 2 which included the following statement: "Due to the decision to buy our Tertiary Amines, there will now be some employees going to Converting on a more permanent basis. The work force reduction caused by the loss of business is well covered in our contract, making identifying the individuals to be displaced simplistic." He then listed the employees to be displaced, in reverse order of seniority, and plaintiff was not among them. Indeed, he noted that plaintiff had held high leadership roles and jobs in the past.

### Plaintiff's Complaint of Discrimination

Plaintiff was concerned that both women in non-traditional production positions were to be removed from the Chemicals Department while male employees with much less seniority were to be retained. On December 2, 2009, plaintiff sent an email to Olson (with copies to Geisinger and Wise) stating that her removal was discriminatory and she planned to pursue the matter with the EEOC.[21] Olson was upset, visibly disturbed, and angry after he received plaintiff's email, and Collins was frustrated by it. In her first conversation with Collins about plaintiff's complaint, Wise

---

[20]The email also indicated that Jay Simmons would remain in the Chemicals Department until March 1. His point total should have been only 2.0, however, because the matrix gave him credit for an amines oxide qualification he did not have while it deprived plaintiff of 1.5 points for a specialty pumping qualification she did have and .5 point for being the pumping system owner until August of 2009. Plaintiff's point total thus would have been 3.5, enough to avoid displacement.

[21]Plaintiff also told Wise that she did not receive proper credit on Olson's matrix, but Wise accepted Olson's statement that she had received credit for everything to which she was entitled.

told him that "anything that had to deal with Margaret, that it needed to go through me to try and make sure we were calibrated and that there was nothing that could be perceived as retaliation." Olson sent Wise an email informing her that, according to plaintiff's department file, plaintiff had threatened ten years earlier to go to the EEOC.

On December 18, 2009, two days after P&G officially shut down tertiary amines production at the Plant, Wise and another human resources representative interviewed plaintiff regarding her discrimination complaint. Plaintiff spoke about a number of issues: 1) she and the other female employee in the department (also a minority) each had 20 years of seniority and both were being removed; 2) both minority pumpers were being removed; 3) the pumping job was not going away but was increasing; 4) Olson never responded to her email inquiring about his sub-team; 5) the sub-team process was to be used only for the "make" decision; 6) one of the men on Olson's sub-team commented as follows: "If she thinks she will be able to stay out there she has another thing coming, ha, ha;" 7) that another employee said as follows: "She thinks she can stay, she's going to play the race card;" and 8) Simmons received preferential treatment from Olson.

Twelve days later, Collins met with plaintiff to discuss her use of the company's "call-in" procedure on December 10th and 17th. The procedure allows for a minimum of four hours of pay when an unscheduled employee is called in but then is not needed. On both dates plaintiff confirmed with the scheduler that the department was fully covered, and then she left. Her behavior was consistent with the department's practice. When Collins met with her, however, he accused her of violating the Plant's payroll policy and stated as follows: "Let's be frank here, I know you said you're going to the EEOC." Collins gave her a copy of the payroll policy with certain portions highlighted, including one that referred to disciplinary action up to and including termination for

inaccurate data entry.  Plaintiff interpreted Collins's actions as retaliation for her EEOC activity and on January 4, 2010, she sent Wise an email stating as much.   When Wise spoke to Collins the following day, Collins stated that plaintiff had told him that she left early on the two dates in question because the male employees were sitting around and letting her do all the work and that women in the Chemicals Department get overlooked all the time.   Collins followed up with Wise on January 6 and 8 regarding his desire to pursue disciplinary action against plaintiff.  In response, Wise told Collins: "I believe further pushing will indeed look like retaliation to an outside impartial source."

### Plaintiff's Move to Converting Department

On December 18, 2009, plaintiff learned via email that she was to report to the Converting Department on January 4 to begin working in an auxiliary operator position.  Auxiliary operator positions are entry-level positions and, although plaintiff performed the job, she found it demeaning.[22]  Her hourly rate of pay remained the same, but plaintiff lost approximately $9,000 a year in wages because she did not have the same overtime opportunities that she had in the Chemicals Department.  Moreover, even though plaintiff trained on additional machines, she was not eligible to bid on a pumper position in the Converting Department.

On February 9, 2010, Wise informed Collins and Olson that she had completed her investigation into plaintiff's discrimination claim and had concluded that there was insufficient data to support a claim of gender/race discrimination.  Perhaps as soon as that same day, Collins and Olson eliminated the pumper position (the position plaintiff had held) from the Chemicals

---

[22]None of the male employees who were displaced from the Chemicals Department in the second wave of transfers were placed in entry-level positions.

11

Department. On February 16, 2010, Wise met with plaintiff and informed her that P&G had found insufficient evidence to substantiate her discrimination complaint, and Collins announced that the Chemicals Department would no longer have "pumping T4 roles" and all other displacements from the Department would be based on seniority. Wise recognized that plaintiff was the only person who would be impacted by the elimination of the pumper position; with the position no longer existing, plaintiff's temporary move away from the Chemicals Department became permanent. Although P&G stated in its response to plaintiff's first EEOC charge that the terms of its contract with the union had required the company to eliminate the position, Wise confirmed that wasn't so. Indeed, she acknowledged that the only way in which the union contract allowed for the displacement of more senior employees was if a skill was to be totally eliminated, which she acknowledged was not the case in this instance. Moreover, within three months, the pumper position returned to the Chemicals Department, but plaintiff was not given the opportunity to return to her former position. Wise expressed her concern about this sequence of events in an email to Collins dated April 27, 2010:

> John, I reviewed the Chemicals-Surfactants OP Model with Jeff on Monday. And I discussed with him the key risks/issues that immediately came to mind . . . However, one of these issues is much bigger (in my mind) than all the rest, and it impacts the EEOC case with Margaret Morales. Our justification for moving Margaret permanently to Converting was the elimination of "Pumping" positions . . . Now in this proposed organizational design, pumping positions now come back (3 mo later)! I assume you would say that this is a NEW organization, but . . . I can't imagine this will be easily understood, or acceptable, by anyone from the outside looking in at this case. And quite honestly, I am "hard pressed" in figuring what I would say if questioned.[23]

---

[23]In October of 2009, local management understood that if the company made a "buy" decision, the Chemicals and Surfactants departments would merge. Wise's mention of a new organization presumably refers to this merger.

On March 29, 2010, plaintiff filed her first charge of discrimination, alleging discrimination on the basis of race, sex and national origin, and retaliation arising out of her displacement and the elimination of her position. On September 30, 2010, plaintiff filed her supplemental second charge of discrimination, in which she included a claim alleging discrimination and retaliation because she had not been allowed to return to the Chemicals Department or transfer to other available positions. In October and November of 2010, three males who had been temporarily assigned to other departments returned to the Chemicals Department, and on May 3, 2011, plaintiff filed her supplemental third charge of discrimination, including this fact and the disciplinary issues described below.

### Disciplinary Issues

Plaintiff also raises issues with respect to disciplinary actions in both the Chemicals and Converting Departments. On November 17, 2009, Olson purportedly created two "documented coachings" regarding plaintiff's performance, which he claimed to have discussed with her. Plaintiff denies having received either one. And on November 20, 2009, Olson purportedly gave plaintiff a Step 1 discipline for an incident that had occurred in July of 2009. Plaintiff also denies having received this. According to company protocol, Olson was to have another manager co-sign disciplinary documents if the employee refused to sign it, and the documents bear no co-signature. Plaintiff learned of these documents in January of 2011 when she received a Step 1 disciplinary notice for a mislabeling incident. Plaintiff and another employee failed to notice a mechanical error by a labeling machine, and nine days later she received the Step 1 from her manager, Diego

Bianchi.[24]  When plaintiff and Bianchi met on January 19, 2011 to discuss the Step 1 discipline, he showed her the November 2009 Olson disciplinary documents.  Morales was seeing them for the first time and she became upset and told her supervisor that they were lies.  The November documents were not in plaintiff's personnel file,  and Olson was unable to explain why he waited seven months to impose a Step 1 discipline.

### Plaintiff's Return to Chemicals Department

On May 11, 2011, six days after plaintiff filed her third charge of discrimination, Wise sent plaintiff by email an offer to return to the Chemicals Department  as a Material Handler without having to bid on the position.  Wise cited plaintiff's seniority and her interest in returning to a pumping position, and stated that the offer was being made before the company filled the position via internal posting or hiring.  Plaintiff accepted the offer, and in June of 2011 she returned to the now combined Chemicals and Surfactants Department as a pumper.  As a result of having been displaced for 17 months, plaintiff lost at least $9,000 per year in overtime compensation and holiday pay, plus an additional 22% in company contributions toward her retirement.

## III.    Discussion

Title VII makes it an unlawful practice for an employer "to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."[25]   Plaintiff has not come forward with

---

[24]Three days before he gave her the Step 1, Bianchi wrote in her Work & Development Plan that she had delivered great results for the department.

[25]42 U.S.C. § 2000e-2(a)(2).

direct evidence of discrimination, so the Court evaluates her claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*.[26]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[27]  To establish a prima facie case of discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[28]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[29]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[30]

Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has "participated . . . in an investigation, proceeding or hearing."[31]  In the absence of direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework.[32]  The

---

[26]411 U.S. 792, 802-05 (1973).

[27]*Id.* at 802.

[28]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007).

[29]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[30]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[31]42 U.S.C. § 2000e-3(a).

[32]411 U.S. at 802-04.

elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[33]

***Adverse Employment Action/Fourth Theory of Recovery***[34]

Defendant does not dispute that plaintiff is a member of more than one protected class, but it argues that plaintiff did not experience an adverse employment action. According to defendant, neither a temporary nor a permanent move from one department to another qualifies as an adverse employment action, particularly where plaintiff maintained her same rate of pay upon transfer, nor does a threat of termination in the event of further misconduct or an oral reminder so qualify.

Plaintiff argues that her displacement and 17-month exclusion from the Chemicals Department caused her an economic loss of at least $20,000 due to fewer overtime hours and holiday pay and a 22% reduction in the company's contribution to her retirement fund. The Tenth Circuit recognizes that an adverse employment action includes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities

---

[33]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[34]The Court follows the convention in the Pretrial Order by ruling plaintiff's claims according to her theory of recovery, as opposed to the counts of her First Amended Complaint, as some of the counts contain more than one theory.

or a decision causing a significant change in benefits."[35]  The Court agrees that the economic loss which plaintiff suffered in a 17-month period was of sufficient significance to constitute an adverse employment action.  Plaintiff offers no explanation, however, for how she suffered an adverse employment action as a result of Collins's December 30, 2009 unrealized threat to terminate her employment, and the Court finds that the threat of termination and oral reminder were not adverse employment actions.  Accordingly, the Court grants defendant's motion with respect to plaintiff's fourth theory of recovery.

As to the remaining theories of recovery, the Court finds that plaintiff has met the elements for a prima facie case of discrimination and retaliation.  The Court will consider defendant's proffered explanations and whether they are pretextual for each theory or set of theories.

### First and Second Theories of Recovery

In her first and second theories of recovery, plaintiff claims that her move from the Chemicals Department was the result of gender and race/national origin discrimination.  Defendant argues that a transfer from one department to another is not an adverse employment action, that the circumstances surrounding the move do not give rise to an inference of unlawful discrimination, and that plaintiff has not demonstrated evidence of pretext.  In response, plaintiff offers 21 paragraphs of factual assertions from which she asserts that a clear and compelling inference of discrimination arises.

---

[35]*Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).  The "adverse employment action" is an element of a discrimination claim.  As to her retaliation claims, plaintiff need only demonstrate that she suffered a "materially adverse action," which is a more lenient standard.  *See Sifuentes v. United Parcel Serv.*, No. 10-2178, 2012 WL 5907385, at *8 (D. Kan. Nov. 26, 2012).

Plaintiff does not directly address defendant's argument that her transfer does not qualify as an adverse employment action because it did not involve significant adverse changes to her working conditions. In spite of the lack of refutation, however, the cases defendant cites do not offer significant support for its position.[36] An employer's conduct creates an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[37] Plaintiff may have continued to be paid at the same hourly rate in her new position, but losing $20,000 in overtime, holiday pay, and retirement contributions is a significant change. Moreover, plaintiff's new assignment to an entry-level position created significantly different responsibilities than she had become accustomed to and enjoyed after 20 years of employment. Defendant's characterization of the transfer as mere inconvenience or alteration of job responsibilities is inaccurate.

Similarly, plaintiff has presented sufficient evidence to suggest that the circumstances surrounding her move from the Chemicals Department raise an inference of unlawful discrimination. Defendant describes the process in which P&G decided who would move as being in the hands of a sub-team of volunteers and the union, with Olson offering mere suggestions. While the evidence does indicate that Olson enlisted employees to participate in the sub-team and that he worked with

---

[36] *Lara v. Unified School District #501*, 350 Fed. App'x 280, 284 (10th Cir. 2009) (alleged threat to transfer plaintiff not an adverse employment action without evidence that transfer would have materially adverse consequences on working conditions); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (lateral transfer not adverse employment action where evidence showed only change was increasing commute time by approximately 30 minutes).

[37] *Burlington Indus., Inc. v. Ellerth*, 524 U.S.742, 761 (1998).

them to come up with the list of displaced employees, there is no evidence that P&G ceded decision-making to the group.[38] Similarly, although the union was involved in the decision to eliminate the Tech 4 Pumper position in the Chemicals Department, Olson admitted that the idea originated with him and Collins and there is no evidence that the union played a deciding role. Regardless of those details, however, Wise admitted that plaintiff was the only person to be adversely affected by the decision to eliminate the Tech 4 Pumper position because the others who were permanently displaced would have lost their positions in the Chemicals Department because they lacked seniority.

Indeed, it is this last fact which also supports plaintiff's position that P&G's use of the "multiskill matrix" and eliminating the Tech 4 Pumper position was a pretext for unlawful discrimination. Defendant cannot plausibly rely on the matrix as an objective vehicle for plaintiff's transfer, as plaintiff has revealed evidence that the matrix was to be used only in the event that the company decided to "make" instead of "buy" tertiary amines, and that in the event of a "buy" decision employees would be moved only on the basis of seniority. Finally, there is no dispute that the pumping function did not cease but in fact increased, that a man took plaintiff's pumper position after she left, and that the nine displaced employees included the only two women in the department in non-traditional operations jobs, both of whom are members of racial minorities. A rational trier of fact could determine that defendant's stated reasons for plaintiff's transfer were unworthy of

---

[38]On the other hand, plaintiff has not submitted evidence to support her assertion that Olson kept her off of the sub-group. She testified that she was "going to" volunteer but never did so. Although Olson closed membership in the group 24 hours earlier than he had said he would, plaintiff did not confront him with the earlier deadline or ask to be allowed to join the sub-group after she learned that Olson was no longer accepting members.

credence based on this evidence. Accordingly, the Court denies defendant's motion with respect to plaintiff's first and second theories of recovery.

### Third Theory of Recovery

Plaintiff claims in her third theory of recovery that she was permanently moved from the Chemicals Department in retaliation for claiming that her temporary transfer was discriminatory. Defendant asserts that plaintiff failed to administratively exhaust this claim and that the record does not contain facts to support a finding of retaliatory conduct. Plaintiff refutes both arguments.

The parties agree that plaintiff is required to timely file a Charge of Discrimination with the EEOC before filing a civil action for alleged violation of Title VII.[39] The reason for this requirement is to put an employer on notice of a violation before a plaintiff files suit, which in turn serves to facilitate internal resolution of the issue.[40] Plaintiff filed three separate charges, but defendant asserts that none included a claim that her permanent move from the Chemicals Department was retaliatory. Defendant is wrong. As plaintiff points out, she included the allegation in her first and second charges of discrimination and in a February 16, 2010, email to Wise in which she wrote the following: "Moving forward, the decision to eliminate the position I held, without allowing me to displace a less senior employee, is retaliation for my protected activity." She included nearly verbatim that sentiment in the questionnaire that she submitted along with her first EEOC charge.

Plaintiff also points to circumstantial evidence supporting the inference that P&G's

---

[39]*Beth v. Espy*, 854 F. Supp. 735, 737 (D. Kan. 1994).

[40]*Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).

elimination of the Tech 4 Pumping position was a retaliatory pretext to keep her out of the Chemicals Department. Defendant admits that the permanent move occurred within a couple of months of her claim that her temporary move was discriminatory, but then argues again that the position was eliminated by P&G and the union. The Court has already addressed the fallacy of this factual assertion and need not do so again. More to the point, Wise testified that she immediately recognized that plaintiff was the only person adversely affected by the decision, and she acknowledged that an impartial third party could look at the conduct as retaliatory. On the basis of these facts, the Court denies defendant's motion with respect to plaintiff's third theory of recovery.

### Fifth to Thirteenth Theories of Recovery

In her fifth through thirteenth theories, plaintiff claims that she was discriminated and retaliated against when she was not offered a pumper position in the Making Department in early 2010, a position in the Chemicals & Surfactants Department in October of 2010, and a pumper position in the Chemicals & Surfactants Department in November of 2010. Defendant raises another exhaustion challenge with respect to the position into which Mark Docman was placed (eighth through tenth theories), but plaintiff included a reference to that position in her third EEOC charge and the Court rejects defendant's argument.[41] Alternatively, defendant argues that employees in rotating roles are generally allowed to return to their departments when their rotations conclude, and

---

[41]Although plaintiff did not identify Docman by name, she alleged in her May 31, 2011 charge that "I have not been given the same opportunity [to transfer back into the Chemicals Department] and was expressly prohibited from bidding on a position in the Chemicals Department in 2010." Plaintiff points out that Olson advised Wise in December of 2010 that nobody other than Docman had moved back into Chemicals, and in its response to plaintiff's third charge P&G noted that plaintiff "again alleges that she has been inappropriately denied an opportunity to work in the Chemicals Department."

that consistent with that practice Docman returned to his Chemicals & Surfactants Department position when his rotation in a Cap Coordinator Role concluded. Accordingly, P&G did not consider any other employee for that position. Plaintiff does not controvert those facts, which constitute a legitimate, non-discriminatory and non-retaliatory reason for Docman to return to his Chemicals & Surfactants Department position. Thus, the Court concludes that plaintiff did not fail to exhaust her claims with respect to Docman, but neither has she demonstrated that defendant's proffered explanation was a pretext. Accordingly, the Court grants defendant's motion with respect to plaintiff's eighth through tenth theories.

Similarly, in November of 2010 Stuart Evans and Mark Fronenberger returned to the Chemicals & Surfactants Department after they completed their temporary assignments in the Converting Department. As with rotating positions, P&G generally allows employees who are temporarily assigned to other departments to return to their department at the conclusion of the assignment. P&G did not consider anyone else for these positions. Plaintiff does not controvert these facts and has not demonstrated that defendant's proffered reason is pretextual. Accordingly, the Court grants defendant's motion with respect to plaintiff's eleventh through thirteenth theories of recovery.

The situation with Jay Simmons is somewhat different. Defendant asserts that he "received [a pumper position in the Converting Department when he was removed from Chemicals in February-March 2010] through the same process by which Ms. Morales received her Converting Department position. As such, no other employee was considered for that position." That statement is not particularly informative, as it does not explain why no other employee – in particular, plaintiff

– was considered for the position.  And plaintiff has set forth a number of facts related to her removal from the Chemicals Department and her placement in an entry level position, none of which defendant addresses in relation to Simmons.  Accordingly, the Court denies defendant's motion with respect to plaintiff's fifth through seventh theories of recovery.

### Fourteenth to Seventeenth Theories of Recovery

In her last four theories of recovery, plaintiff alleges that she experienced discriminatory and retaliatory discipline in the form of two Step 1 disciplines.  Defendant asserts that Olson created a Step 1 discipline on November 20, 2009, which referred to an earlier incident of plaintiff's failure to follow standard operating procedures, but plaintiff denies having received it from Olson.  On January 18, 2011, Bianchi issued a Step 1 discipline to plaintiff related to her "failure to identify incorrect label orientation after brand change."  Defendant argues first that these disciplinary actions, which it refers to as "oral reminders," do not qualify as adverse employment actions.

Defendant states that P&G addresses performance issues through the following avenues:  1) a documented coaching, which is a document that reflects that a manager has informally addressed an issue with an employee; and 2) Progressive Discipline, which includes four possible steps numbered from 1 through 4.    Step 1 is an oral reminder; Step 2 is a written reminder; Step 3 is a decision-making leave; and Step 4 is termination.  Defendant cites Wise's deposition testimony as the evidentiary support for these facts, but Wise did not refer to Step 1 as an "oral reminder," nor did she ever identify what occurs at any step other than Step 4 (which she did identify as termination).  Thus, defendant has no factual basis to support its argument that Step 1 does not qualify as an adverse employment action.  Indeed, P&G's management training manuals instruct that

"[a]ny level of discipline will impact employee career development opportunities: [p]romotion and [j]ob bids."

Defendant also argues that no facts suggest that either Step 1 discipline was discriminatory or retaliatory. With respect to the Step 1 from Olson, defendant chronicles "Documented Coachings" dated June 15, November 17, and December 3, 2009, along with the "Documentation of Positive Discipline" (the Step 1 discipline) issued on November 20, 2009, but does not address plaintiff's adamant assertion that she never knew about any of these until Bianchi issued a Step 1 discipline on January 18, 2011. Even though P&G policy calls for Step 1 discipline documents to be placed in an employee's personnel folder, Wise confirmed that no such documents issued by Olson were in plaintiff's folder. Moreover, plaintiff questions why there was a four-month delay between the incident for which Olson purportedly disciplined plaintiff and the date he claims to have given her the document. According to Wise, the longest lag time she had seen between an incident and imposition of discipline was two to three weeks. Olson admits that when he purportedly gave plaintiff two documented coachings on November 17, 2009, he did not discuss with her the incident he asserts occurred four months earlier that justified a Step 1 discipline – a discipline Olson allegedly imposed on November 20.

Wise also testified that Olson was visibly disturbed and angry when he received an email from plaintiff on December 2, 2009, in which she alleged that her removal from the Chemicals Department was discriminatory. This timing forms the basis for plaintiff's allegation that Olson fabricated all of these disciplinary documents to retaliate against her complaint, with the December 3

Documented Coaching bearing the latest date.[42]  Because the Court is to view the facts in the light most favorable to plaintiff, the Court denies defendant's motion with respect to plaintiff's fourteenth and fifteenth theories of recovery.[43]

Finally, plaintiff challenges the Step 1 discipline which she received from Bianchi after she moved to the Converting Department as both discriminatory and retaliatory.  Defendant denies that it was discriminatory by pointing out that employee James Hathaway received a Documented Coaching for his role in the same incident.  Looked at in the light most favorable to the non-movant, however, a Documented Coaching does not fall within P&G's Progressive Discipline, whereas a Step 1 discipline does.  Standing alone, however, the different levels of discipline do not suggest discriminatory treatment, as plaintiff has not refuted Bianchi's testimony that plaintiff and Hathaway had different levels of responsibility for the incident.

As for the retaliatory claim, the record supports defendant's assertion that ultimately the January 2011 Step 1 discipline was separate from the Olson Documented Coachings and Step 1 discipline.  The January 2011 Step 1 originally stated:  "Based on the severity of the incident and previous coachings she has received, we determined Step 1 was the appropriate level of discipline."  As defendant points out,  plaintiff grieved the January 2011 Step 1 notice because she denied having

_____

[42]Plaintiff's denial of having received any of the Documented Coachings or the Step 1 discipline from Olson makes her discrimination complaint similar to her retaliation complaint, which is that Olson created the documents to support his discriminatory decision to remove plaintiff from the Chemicals Department.  Plaintiff also points out the undisputed fact that Olson never gave a Step 1 discipline to another employee the entire time he was a manager at the Plant.

[43]Defendant contends that it has produced evidence to conclusively demonstrate that Olson did not fabricate the Step 1 discipline by producing the "electronic footprint" of the document.  The footprint defendant produced is not authenticated, nor can it be relied upon to show that no other changes were ever made.

received the underlying Olson discipline. P&G removed from the January 2011 records all references to the Olson Step 1, but determined that the later one was warranted on account of the significant quality issue that occurred on the line. Moreover, as defendant argues, the significant gap in time between late 2009 when plaintiff complained of discrimination and the January, 2011 discipline weakens any inference of retaliatory motive.[44]

Based on the foregoing, the Court grants defendant's motion with respect to plaintiff's sixteenth and seventeenth theories.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Rule 56 Summary Judgment (Doc. 37) is GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED** that summary judgment shall be granted to Defendant on Plaintiff's Fourth, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Sixteenth, and Seventeenth Theories of Recovery.

**IT IS FURTHER ORDERED** that summary judgment shall be denied on Plaintiff's First, Second, Third, Fifth, Sixth, Seventh, Fourteenth, and Fifteenth Theories of Recovery.

**IT IS SO ORDERED.**

Dated: <u>May 15, 2013</u>

<u> S/ Julie A. Robinson </u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[44]*See Blackwell v. Shelter Mut. Ins. Co.*, 109 F.3d 1550, 1555 (10th Cir. 1997).